## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

UNITED HEALTHCARE SERVICES, INC.,

Plaintiff,

v.

BROADCOM INC. and CA, INC.,

Defendants.

Case No. 25-cv-01189 (JWB/SGE)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR AN EMERGENCY PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................. 4

    A.    The CA Software Plays a Critical Role in United's Business. ........... 4

    B.    Reflecting the Critical Importance of the CA Software and Services to United's Business, The Agreement Provides United with Continued Access and Protection ███████████████████ ................................................................................................... 9

    C.    In 2018, Broadcom Took on $18 Billion in Debt to Acquire CA. ... 12

    D.    In 2023, Broadcom Assumed Over $36 Billion in Additional Debt to Acquire VMware. .............................................................................. 13

    E.    Broadcom Then Repudiated its Agreement with United. ................ 14

    F.    Broadcom Further Breached the Agreement by Refusing to Fill United's March 14, 2025 Order. ...................................................... 18

LEGAL STANDARD ......................................................................................... 19

ARGUMENT ...................................................................................................... 20

    I.    UNITED IS LIKELY TO SUCCEED ON THE MERITS. ......................... 20

    II.    ABSENT A PRELIMINARY INJUNCTION, BROADCOM'S ACTIONS WILL INFLICT SUBSTANTIAL IRREPARABLE HARM ON UNITED. ................................................................................................... 27

    III.    THE BALANCE OF HARMS SUPPORTS A PRELIMINARY INJUNCTION. ............................................................................................ 31

    IV.    THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION.. 33

CONCLUSION .................................................................................................. 33

# TABLE OF AUTHORITES

## Cases

*Bruntlett v. Bruntlett*,
  2023 WL 19797 (Minn. Ct. App. Jan. 3, 2023) ............................................. 25

*Coteau Properties Co. v. Dep't of Interior*,
  53 F.3d 1466 (8th Cir. 1995) ....................................................................... 28

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ....................................................................... 19

*Detroit Med. Ctr. v. GEAC Computer Sys., Inc.*,
  103 F. Supp. 2d 1019 (E.D. Mich. 2000) ..................................................... 30

*Hillerich & Bradsby Co. v. Christian Bros., Inc.*,
  943 F. Supp. 1136 (D. Minn. 1996) ........................................................ 31, 32

*Iowa Utilities Bd. v. F.C.C.*,
  109 F.3d 418 (8th Cir. 1996) ....................................................................... 29

*Jax Ltd., Inc. v. Reuter*,
  2005 WL 3272060 (D. Minn. Nov. 28, 2005) .......................................... 31, 32

*Lamoureux v. MPSC, Inc.*,
  849 F.3d 737, 742 (8th Cir. 2017) .......................................................... 25, 26

*Legred v. Smeal Pork Co.*,
  2002 WL 31819222, at *2 (Minn. Ct. App. Dec. 17, 2002) .......................... 26

*Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*,
  336 F.3d 801 (8th Cir. 2003) .............................................................. 28, 29, 33

*Norick, Inc. v. Hays Companies, Inc.*,
  2023 WL 7623753 (D. Minn. Nov. 14, 2023) .......................................... 25, 26

*Perdue Premium Meat Co., Inc. v. Missouri Prime Beef Packers, LLC*,
  2022 WL 193217 (W.D. Mo. Jan. 20, 2022) ................................................ 31

*Pineville Med. Ctr., LLC v. Computer Programs & Sys., Inc.*,
  2019 WL 5873443, at *3 (E.D. Ky. Feb. 15, 2019) ...................................... 30

*Rogers Group, Inc. v. City of Fayetteville, Ark.*,
  629 F.3d 784 (8th Cir. 2010) ....................................................................... 28

*Sleep No. Corp. v. Young*,
  33 F.4th 1012 (8th Cir. 2022) ......................................................... 19, 20, 33

*United Healthcare Ins. Co. v. AdvancePCS*,
  316 F.3d 737 (8th Cir. 2002) ....................................................................... 28

*Vital Images, Inc. v. Martel*,
  2007 WL 3095378 (D. Minn. Oct. 19, 2007) .................................................29

**Statutes and Rules**

Federal Rule of Civil Procedure 65 ....................................................................19

**INTRODUCTION**

Plaintiff United HealthCare Services, Inc. ("United" or "UHS") seeks an emergency preliminary injunction enjoining Defendants Broadcom Inc. and CA, Inc. (collectively "Broadcom") from cutting off access to the software and associated services that United is entitled to under the parties' contract. Absent action by this Court, Broadcom intends to cut off United's access to those software and services, which United has been using for almost twenty years. That will cause immediate irreparable harm to United, its members, and the general public.

The software (referred to herein as the "CA Software") and the associated maintenance and support services ("Maintenance and Support," and together with the CA Software, the "Software and Services") are critical to the operation of United's business. In particular, they are integral to United's mainframe computer system (as well as other systems) and are interwoven with United's business and information technology systems in ways that impact virtually all aspects of its business. The functions of the CA Software include:

- ████████████████████████████
  ████████████████ ;

- Keeping United's information technology systems ████████
  ████████████████████████████████
  ████████████████████████████████
  ████████████ ;

- Enabling United's ████████████████████████
  ████████████████ ; and

- Enabling United's ████████████████████
  ████████████████ .

1

Loss of access to the Software and Services would therefore cause immediate, wide-ranging, and substantial irreparable harm to United's business.

United's contract with Broadcom, known as the Master Software License and Services Agreement (the "Agreement"), protects United's right to uninterrupted access to the Software and Services at ███████████████████████████████████████████ Declaration of Sue Heintzelman, Ex. A (Agreement, at Exhibit H) §§ 4.3, 4.4.[1]  The Agreement stipulates that the ████████████████████████████ payable by United for ██████████████████████████████████.  *Id.* (at Exhibit H) § 4.4.  The Agreement defines ████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████  *Id.* (at Exhibit H) § 1.7.3.  The Agreement then provides the following unambiguous requirement:

████████████████████████████████████████████████ ██████████████████████

*Id.* (at Exhibit H) § 4.4.  This ████████ applies to United's current orders of Software and Services.  In direct violation of section 4.4, however, Broadcom is demanding that United now pay fees that are ████████████████████████████ to renew its licenses under the Agreement, or it will sever access to the Software and Services.  That is a

---

[1] Alphabetical exhibit references refer to the exhibits to the Heintzelman Declaration. Numbered exhibits references refer to the exhibits to the Declaration of Hamish Hume.

breach of the above provision and of several other provisions that confirm United's right to renew access to the Software and Services ████████████████████████████.

United is currently paying a ████ to Broadcom for "Term Licenses" that were originally set to expire on March 30, 2025, but which were then extended to April 18, 2025 (the deadline when Plaintiff's Complaint was filed), and then extended again to May 23, 2025, to allow for this motion to be decided before such expiration.  Contrary to Broadcom's contractual obligations and historical practice of agreeing to renewals at prices that are ████████████████, Broadcom is demanding exorbitant price increases that are ██████████████████.

United has been negotiating with Broadcom for several months to resolve this dispute, making clear it will pay ████████████████████ ████████████████████ All to no avail: Broadcom insists on its exorbitant demands.

Broadcom's naked repudiation of the Agreement is not an isolated event.  It reflects a business strategy Broadcom adopted after acquiring both CA (in 2018) and another software company, VMware (in 2023).  VMware has a dominant position in the market for so-called "virtualization" software.  Broadcom has sought to exploit VMware's dominant position by trying to force customers to purchase CA and VMware software on a "bundled" basis, by massively increasing the prices on both, and by demanding the purchase of software and services that customers do not need.

Rather than try to root its position in the Agreement, Broadcom has told United that the Agreement's terms do "██████████████████████████

██████.” Ex. M (Dec. 4, 2024 Keller email) at 1. That is a transparent admission that Broadcom is repudiating its contractual obligations and seeking to coerce United into abandoning its contractual rights in favor of a new deal that makes vastly more money for Broadcom.

In sum, Broadcom is threatening vast, incalculable, and irreparable harm to United's business in plain violation of Broadcom's contractual obligations. To avoid that irreparable harm, United asks the Court to enter a preliminary injunction on or before May 23, 2025, that precludes Broadcom from cutting off access to the Software and Services until such time as this Court can resolve the merits of this contractual dispute.

## FACTUAL BACKGROUND

### A. The CA Software Plays a Critical Role in United's Business.

United and its affiliates provide and administer health benefit plans and operate other healthcare businesses across the country. To operate those businesses, United relies on CA Software and Services to manage and maintain the mainframe computers that process more than a million healthcare claims on average each day. *See* Declaration of Babu Krishnan ("Krishnan Decl.") ¶¶ 4, 6–7, 9–11, 17; Declaration of Theodore Mansk ("Mansk Decl.") ¶¶ 4, 9–11; Declaration of Christian Bongartz ("Bongartz Decl.") ¶¶ 5, 8–12, 14, 16, 17, 20; Declaration of Amanda Billingsley ("Billingsley Decl.") ¶¶ 5, 9, 10, 12, 17, 20.

*First*, the Software and Services are critical to ensuring continued performance and uninterrupted access to the mainframes. For example, ████████████████

████████████████████████████████████████████

██████████████████. Mansk Decl. ¶ 8.  These ████████████████████████

███████████████████████████████████████████████████

████████████████████ *Id.* ████████████████████████████████████

███████████████████████████████████████. *Id.* ¶¶ 9–11.

Additional CA Software, ████████████████████████████████████████

████████████████████████████████. *Id.* ¶ 26.

*Second*, the Software and Services are necessary ████████████████

███████████████████ United uses ██████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████.  Krishnan Decl. ¶¶ 6–11.  Ensuring that United's applications and systems are

updated with accurate information is critical to these functions.  For example, ████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ *Id.* ¶ 10.  Likewise, █████████████

███████████████████████████████████████████

███████████████████████████ *Id.* ¶ 9.

United also updates its mainframe applications regularly to enhance performance, increase functionality, and address errors. ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████. Krishnan Decl. ¶ 6. ████████████████████████ ████████████████████████████████████████████. *Id.* ¶ 10. ███████████ ████████████████████████████████ perform similar functions depending on the segment of United's business that is involved. Billingsley Decl. ¶¶ 8–9, 11–12. Without ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ Krishnan Decl. ¶¶ 7–11; Billingsley Decl. ¶¶ 8–9, 11–12.

*Third*, CA Software tools ensure United representatives can perform various functions at the level of efficiency that the scale of its business requires. Krishnan Decl. ¶¶ 14–19. Those functions include ████████████████████████████████ ████████ *Id.* ¶¶ 16–17, 19. For example, █████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* ¶ 14. ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████ ██████████████████████ *Id.* ¶¶ 14, 16. █████████████████████████████ ████████████████████████████████████████████████████████████████████

██████████ *Id.* ¶¶ 16–18. ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████ *Id.* ¶ 16.

*Fourth*, United relies on ████████████████████████

████████████████████████████████████████████

████████████████ Billingsley Decl. ¶¶ 13–18.  Without this software, ████████

█████████████████████████ *Id.* ¶¶ 14–15.

*Fifth*, United's affiliated OptumRx business relies on ████████ Bongartz Decl. ¶¶ 11–20.  OptumRx operates as both a pharmacy benefits manager (a company that negotiates and administers pharmacy benefits) and a pharmacy (fulfilling and providing home delivery of prescription medications).  *Id.* ¶ 6.  OptumRx facilitates the fulfillment or claims adjudication of over five million prescriptions per day.  *Id.*  United depends on OptumRx to administer the prescription benefits for certain United members.  *Id.* ¶ 7.

████████ allows OptumRx ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████.  *Id.* ¶¶ 8–11.

OptumRx ████████████████████████████████

██████████████████████.  *Id.* ¶¶ 11–15.

*Sixth*, the Software and Services are critical to the operation of United's network. Declaration of Nikhil Vitkar ("Vitkar Decl.") ¶¶ 7–9. █████████████████████████

███████████████████████████████████████████████████

███████ *Id.* ¶¶ 3–4. The network provides secure connectivity across all lines of business ██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████. *Id.* ¶¶ 4–6. CA Software ████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████ *Id.* ¶¶ 7–8. Without

████████████████████████████████████████████

████████████████████████████████████████

██████████ *Id.* ¶ 10. Given the complexity of United's network ███████████

███████████████████████████████████████████

███████████████████████████ *Id.* ¶¶ 11–19.

United also relies on CA's Maintenance and Support, including for software updates (including bug fixes, security patches, and other improvements), troubleshooting, and issue resolution. *See* Krishnan Decl. ¶ 20; Mansk Decl. ¶ 29; Bongartz Decl. ¶ 21; Billingsley Decl. ¶ 23; Vitkar Decl. ¶¶ 11–16. Without this Maintenance and Support,

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████ *See, e.g.*, Vitkar Decl. ¶¶ 11–19.

8

In sum, without access to these CA Software and Services, United would be

unable to ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████

## B. Reflecting the Critical Importance of the CA Software and Services to United's Business, The Agreement Provides United with Continued Access and Protection ████████████████████████████

United entered into the Agreement with CA, Inc. in 2006. *See* Ex. A at 1. CA

Software is, in Broadcom's own words, "mission critical," a term designating software so

crucial that an organization must have uninterrupted access to it to continue operating.[2]

Because of the vital role the CA Software would play in United's business, United

negotiated specific provisions to ensure that United could maintain uninterrupted and

secure access to the Software and Services with protection against excessive price

increases.

*First*, Exhibit H to the Agreement places a ██████████████████████████

███████████████████████████████████████████████████████████████████

██████████ Ex. A (at Exhibit H) §§ 4.3, 4.4. It first defines ███████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ *Id*. (at Exhibit H) § 1.6. It then

defines ████████████████████████████████████████████████████████

---

[2] Ex. 2 (Broadcom July 2018 Press Release) at 1.

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ *Id*. (at Exhibit H) § 1.7.3.  Those fees are subject to

the following ██ :

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████

*Id.* (at Exhibit H) § 4.4.

     This makes clear that Broadcom may not increase the price charged for any

renewal of a ████████████████████████████████████████████

█████████████████ Exhibit H further provides that ██████████ also applies to

Maintenance and Support fees that are charged on a standalone basis when the

Maintenance and Support is for software subject to a "Perpetual" license.  *Id.* (at

Exhibit H) § 4.3.  Under Exhibit H, ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████. Exhibit H also states that all Maintenance

and Support terms █████████████████████████████████████████

██████████████████████ *Id*. (at Exhibit H) § 4.1.

     *Second*, section 10.1 of the Agreement provides that if United ████████████

██████████████████████████████████████████████████

█████████████████████ Broadcom ████████████████████████████

██████████████████████ Ex. A § 10.1.  Section 10.1 also provides that ██████████

██████████████████████████████████████████████████

█████████████████████████████████████ *Id.*  Thus, United can ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ *Id.*

    *Third*, the Agreement provides that United may ███████████████████████

████████████████████████████████████████████████████████████████████

████  Ex. A § 2.3; *id.* (at Exhibit H) § 2.1.

    *Fourth*, the Agreement requires Broadcom to provide Maintenance and Support to

United for the Software.  Specifically, Broadcom must support █████████████████

██████████████████████████████████ *Id.* (at Exhibit B) § I(h).

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ *Id.* (at

Exhibit B) §§ I, II.

    *Fifth*, the Agreement entitles United to receive ██████████████████

████████████████████████████████████████████████

████████████████. *Id.* § 2.7.

    *Sixth*, the Agreement provides enterprise-wide rights for all "Affiliates," defined

as all entities controlled by United or under common control (*i.e.*, directly or indirectly

controlled by UnitedHealth Group, Inc., United's parent): █████████████████████

████████████████████████████████████████████████

████████" *Id.* § 1 (definition of "Affiliate(s)"); *see* Heintzelman Decl. ¶ 2.

**C. In 2018, Broadcom Took on $18 Billion in Debt to Acquire CA.**

In November 2018, Broadcom—at the time a semiconductor company with limited software assets—acquired CA for $18.9 billion. Ex. 1 (Press Release) at 1. Broadcom took on $18 billion in debt—over 95% of the purchase price—to finance the transaction, which resulted in CA becoming a wholly-owned Broadcom subsidiary. *See* Ex. 2 (Press Release) at 1; Ex. 3 (Proxy Statement) at 2. Broadcom's CEO, Hock Tan, explained that CA's "sizeable installed base of customers" (including United) made it a desirable asset to "add to our portfolio of mission critical technology businesses." Ex. 2 at 1.

After the acquisition, Broadcom initially abided by the Agreement. In 2019, the parties executed Order 115, which renewed United's access for three years at

 Ex. B (Order 115) at 2. On March 18, 2022, United placed Order 126, 

Ex. C (Order 126) §§ 2, 6. Consistent with the Agreement, Order 126 provides for

*Id.* at 2.

Additional Software under the Agreement is covered by three other orders with the same expiration date (originally March 30, 2025) as Order 126:

■ *See id.* (all); Ex. C at 2.  Additionally, United has purchased increases to the

authorized units for certain of its CA Software licenses.  *See* Heintzelman Decl. ¶ 8.

### D.  In 2023, Broadcom Assumed Over $36 Billion in Additional Debt to Acquire VMware.

On May 26, 2022, Broadcom announced that it had entered into an agreement to

purchase VMware.  Broadcom described the VMware acquisition as advancing

Broadcom's "track record of acquiring established, ***mission-critical*** platforms."  Ex. 4

(Press Release) at 1 (emphasis added).  By one estimate, VMware controls 97% of the

virtualization market, by revenue.  Ex. 5 (Nov. 2024 CIO Dive Article) at 6.

Broadcom's acquisition closed on November 22, 2023 for $69 billion.  Ex. 6 (Nov.

2023 Reuters Article) at 2.  As with the CA acquisition, Broadcom relied heavily on debt

financing to acquire VMware, including borrowing over $28 billion under variable-rate

loans.  Ex. 7 (Nov. 2023 Broadcom 8-K) at 3; Ex. 8 (July 2024 Broadcom 8-K) at 11.

Broadcom also agreed to take on $8 billion dollars of VMware debt.  Ex. 4 at 1.

Broadcom's acquisition of VMware—coupled with the massive debt Broadcom

undertook to close—prompted concern among industry analysts and customers that

Broadcom would raise prices.  *See* Exs. 9–11 (May 2022, June 2022, and February 2024

articles).  Broadcom quickly confirmed the legitimacy of these concerns by embarking on

a roundly criticized campaign to force customers to accept exorbitant price increases,

long-term deals, and anti-competitive tying.  Exs. 12–14 (April and June 2024 news

articles).  As an example of the disruptions this campaign has caused, AT&T filed a

lawsuit last year over Broadcom's refusal to honor AT&T's right to renew VMware product support. *See* Ex. 16 (AT&T Complaint). After the Court stated its intent to grant a preliminary injunction, the parties settled. *See* Ex. 17 (Hearing Tr.) 34:17–18; Ex. 18 (Joint Ltr.) at 1.

### E. Broadcom Then Repudiated its Agreement with United.

On September 5, 2024, Broadcom sent United a



Ex. K (Sept. 5, 2024 Keller email, at attachment, "AMENDMENT TWO") § 6.1 (emphasis added). United rejected Broadcom's attempt to curtail United's rights under the Agreement. *See* Heintzelman Decl. ¶ 11.

That same month, Broadcom met with United and proposed replacing United's CA and VMware agreements with a new contract between United and Broadcom. United responded that it would only agree to this change if all the terms from United's existing agreements with Broadcom's subsidiaries, including the CA Agreement, were included. Heintzelman Decl. ¶ 10.

On November 11, 2024, Broadcom again sought to renegotiate the Agreement to eliminate United's critical contractual protections. *Id.* ¶ 12. Broadcom sent

███████████████████████████████████████████████████

█████████████████ *See* Ex. L (Nov. 11, 2024 Keller email) at 1. Despite United's

insistence that any such agreement include United's existing contractual rights, the

proposed ████████████████ sought to eliminate those rights.

Most notably, the proposed ████████████████ eliminated ██████████

████ Heintzelman Decl. ¶ 12. In its place, the ██████████████████

██████, which would apply *only* during the █████████████████████

█████████████████ Ex. L (at █████████████████████") § 5.6.

Once that term ended, the proposed ████████████████ imposed no limit on how

much Broadcom could increase prices for the next term. *See id.*

The proposed ████████████████ also sought to eliminate United's negotiated

rights to █████████████. It ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ to United, *id.* (at

attachment, ██████████████████████████████ § 2.3. The ███████████

██████████ also makes no provision for providing United with the ████████████

██████████████████████████

By contrast, under the Agreement, Broadcom must support ████████████

███████████████████████████████ Ex. A (at Exhibit B)

§ I(h). Broadcom must also provide ███████████████████████████████

███████████████████████████ *Id.* If Broadcom does so, United is

then entitled to ██████████████████████████████████████ ████████████████████████████. *Id.* § 8.

Like Broadcom's September 2024 ████████████████, the proposed ██████████████████ also sought to require United to ████████████ ████████████████████████████ the CA Software and Services. Ex. L (at attachment, ████████████████ § 10.4.

United informed Broadcom that while United was willing to continue discussing ███████████████████████████████████████████. Heintzelman Decl. ¶ 13. In response, Broadcom indicated that if United did not ████████ ████████████, Broadcom would cease doing business with United. *See id.*

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████



Ex. M at 1 (emphasis added).

On December 19, 2024, Broadcom met with United and proposed that United renew the CA Software for ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ Heintzelman Decl. ¶ 15; *compare* Ex. O (Dec. 19, 2024 Keller email, at attachment, ████████████████████████) at 21, *with* Exs. C–J (orders then up for renewal on March 30, 2025). Broadcom also reiterated its position that it would ██ ████████████████████████████████████████████



Ex. O (at attachment, "████████████████████████") at 19. United rejected the proposal and asked Broadcom to provide revised proposals. Heintzelman Decl. ¶ 15. Thereafter, United and Broadcom continued to ████████████████████████████ ████████████████████████████. *See id.* ¶¶ 16-18. However, Broadcom continued to insist ████████████████████████████████████████████ ████████████████ while also insisting that United agree to ████████████████████ ████████████████████ *See id.* ¶¶ 16, 18; Ex. P (Feb. 14, 2025 Keller email, at

attachment, "Broadcom Combined Proposal") at 3; Ex. Q (Feb. 26, 2025 Keller email, at attachment, "Broadcom Combined Proposal") at 2; Ex. R (Mar. 11, 2025 Keller email, at attachment, "Broadcom Combined Proposal") at 2; Ex. S (Mar. 14, 2025 Broadcom Combined Proposal) at 2.

For example, on February 14, 2025, Broadcom proposed ██████████ ████████████████████████████████████████████████████ ████ an amount far exceeding what is permitted under the CA and VMware agreements. Ex. P (at attachment, "Broadcom Combined Proposal") at 3; *see* Heintzelman Decl. ¶ 16. United rejected Broadcom's unlawful demand that United pay exorbitant price increases, simply to retain access to the same CA Software and functionality it has been licensing for years. *See* Heintzelman Decl. ¶ 16.

### F. Broadcom Further Breached the Agreement by Refusing to Fill United's March 14, 2025 Order.

With the expiration of Order 126 (and other orders) only weeks away, and given Broadcom's repeated refusal to abide by the Agreement, United invoked the formal process for renewal orders under ████████ of the Agreement. *See* Heintzelman Decl. ¶ 19; Ex. A § 10.1. On March 14, 2025, United executed an order (the "March 14 Order") for the CA Software and Services it needed and, to avoid the need for further negotiation, the March 14 Order ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ Heintzelman Decl. ¶ 19; *see* Ex. W (Mar. 14, 2025 Adam Young Ltr.) at 1. The total price for this one-year order (taking into account increases in license levels

and the cancellation of certain Software and Services) was ███████████████████ [3] *Id.*

at 3; *see* Heintzelman Decl. ¶ 19.

On March 18, 2025, Broadcom sent United a letter stating that it would not be fulfilling the March 14 Order. Ex. X (Mar. 18, 2025 Broadcom Ltr.) at 1. Broadcom provided no reason for the refusal. *See id.* Broadcom, however, agreed to extend the March 30, 2025 expiration date to April 18, 2025 (now May 23, 2025). *Id.* at 1. The parties have continued to negotiate, but Broadcom has refused to abide by its obligations under the Agreement and has not fulfilled the March 14 Order. *See* Heintzelman Decl. ¶ 21. United was thus left with no choice but to bring this suit to enforce its contractual rights and to ensure it retains access to the Software and Services necessary to operate its business.

## LEGAL STANDARD

"In deciding whether to issue a preliminary injunction, the district court considers four factors: '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest.'" *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "Although no single factor is dispositive, and the district court must balance all factors to

---

[3] Pursuant to Federal Rule of Civil Procedure 65(c), United is prepared to give security for the preliminary injunction in an amount that the Court considers proper under the Agreement.

determine whether the injunction should issue, the third factor—probability of success—is the most significant." *Id*. (cleaned up).

## ARGUMENT

### I.      UNITED IS LIKELY TO SUCCEED ON THE MERITS.

To establish a probability of success on the merits, United "must demonstrate that it has a 'fair chance' of prevailing on the merits." *Sleep No. Corp.*, 33 F.4th at 1016. "To show a fair chance of prevailing, a party must show that its claims provide fair ground for litigation, but it need not show that it has a greater than fifty per cent likelihood of success." *Id*. at 1016–17 (internal citations and quotation marks omitted).

Here, United's chance of success far exceeds that benchmark for a "fair chance." *Id.* United is highly likely to succeed on the merits because Defendants' position is contrary to the express terms of Agreement. The Agreement provides: ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. A (at Exhibit H) § 4.4. The expiration of United's ██████████ was March 30, 2025, Exs. C–J (orders listing expiration dates), and has now been extended twice: to April 18, 2025, Heintzelman Decl. ¶ 20; and then to May 23, 2025, Meet-and-Confer Statement at 1. Over the past several months, Broadcom has made clear that it will not comply with the ████████ and instead seeks a renewal with vastly higher price increases, ████████████ ████████████ *See* Heintzelman Decl. ¶¶ 15–16, 24; Exs. P–S (Broadcom proposals). In refusing to renew unless United accedes to such demands, Broadcom is violating its contractual obligations.

Broadcom has no credible argument to the contrary. In its negotiations, Broadcom effectively admitted it was not basing its position on anything in the Agreement. Broadcom informed United that ██████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. M at 1. In other words, Broadcom was demanding that contractual terms be ignored, repudiated, or modified to satisfy ████████████████████████████████████ *Id.* That is obviously a must-lose argument in a contractual dispute.

Broadcom offered a similar argument in a December 19, 2024 presentation, ████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████ Heintzelman Decl. ¶ 14. (██████ ████████████████████████████████████████████████████████████ ██████████████████████████████ *See* Ex. A (at Exhibit H) §§ 1.1.4, 1.4; *see* Ex. C at 5– 6.) Such efforts to nullify the contractual language cannot succeed. Nothing in the Agreement allows Broadcom to ████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████ *See* Ex. A (at Exhibit H) § 1.1(b) ██████████████████████████████ ████████████████████████████████████████████████████ Further,

it provides that the █████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

In its March 26, 2025 letter to United, Broadcom purported to lay out some responses to United's contractual points, but the letter's cursory arguments provide no support for Broadcom's refusal to fulfill United's March 14 Order.  *See* Ex. 15 (Mar. 26, 2025 Broadcom Ltr.) at 1.  For example, Broadcom argues that "████████████████████ ███████████████████████████████████████."  *Id.* at 1.  Broadcom ignores that ██████████████████████████████.  *See* Ex. A (at Exhibit H) §§ 1.1, 1.7.3.  ██████████████████████████████████

███████  *Id.* (at Exhibit H) §§ 1.1, 1.7.3.  Per the Agreement, ████████████████ ████████████████████████████████████████████████████

███████████████████████████████  *Id.* (at Exhibit H) § 1.7.3.  ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████  *Id.*; *see, e.g.*, Ex. C § 4 & p.6 ████████

████████████████████████; *id.* p.6 (Exhibit 1).  █████████████████████████

██████████████████████████████

Broadcom further asserts that t███████████████████████████████████

████████████████████████████  Ex. 15 at 1.  Again, this is untenable.  ████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ Ex. A (at Exhibit H) §§ 1.6, 1.7.3, 4.4 (emphasis

added). █████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████ Thus, a Subscription license is a type of Term

License and therefore subject to ███████████████.

Broadcom's "Subscription" argument is also contrary to the Agreement's

statement that all ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████. *See id.* (at Exhibit H) § 4.3.

Broadcom's March 26 letter further ignores the Agreement's plain text by

asserting that ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████" Ex. 15 at 1.  In fact, ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ Ex. A § 10.1 (emphasis added). ██████████████████████████

██████████████████████████████████████████████████, Ex. 15 at 1.

Broadcom also insists that ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ Ex. A § 10.1 (emphasis added). The

Agreement does not give Broadcom discretion to refuse an Order until United agrees to

whatever exorbitant price increase Broadcom demands. To the contrary, section 10.1

provides ████████████████████████████████████████████████

██████████████████████████. *Id.* Broadcom is thus not entitled to reject an order

because it wants to impose a price higher than the █████████████. *See* Ex. M at 1.

Broadcom's March 26 letter also argues (incorrectly) that United does not have

████████████████████████████████████████ Ex. 15 at 1. That

argument ignores ████████████████████████████████████████████████

██████████████ *See* Ex. A (at Exhibit H) § 4.4. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████ *Id.* § 10.1.

Broadcom's position also contradicts ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ United exercised these rights in its March

14 Order, Ex. W, and Broadcom's refusal to fulfill that order is a breach.

Broadcom's argument on renewal rights also contradicts the plain meaning of

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Ex. A (at Exhibit H) § 4.1.  This further confirms that United has ongoing renewal rights, which are subject to ███████████████████.  *See id.* (at Exhibit H) §§ 4.3 ███████ ███████████████████, 4.4 ███████[4]

Broadcom's March 26 letter also asserts that "it is clear under Minnesota case law that implied perpetual contracts are disfavored as a matter of public policy.  And unless an agreement unambiguously states that the duration is perpetual, it should be construed as not permanent."  Ex. 15 at 1.  This is inapt.  *First*, the provisions on which United relies are unambiguous.  Broadcom has neither identified which provisions need to "be construed" nor pointed to any ambiguity therein.  *Id.*

*Second*, Minnesota's doctrine of "perpetual contracts" and "indefinite" contracts is irrelevant, where, as here, the contract "limits the duration" of its terms.  *Bruntlett v. Bruntlett*, 2023 WL 19797, at *5 (Minn. Ct. App. Jan. 3, 2023).  For example, the Eighth Circuit has held that if a "contract stated that it would terminate upon the occurrence of a termination event," the perpetual/indefinite rules do not apply, and therefore no common law right to at will termination exists.  *Lamoureux v. MPSC, Inc.*, 849 F.3d 737, 742 (8th Cir. 2017).  Likewise, Minnesota law recognizes that even "implied" durational limits will defeat the argument, raised here by Broadcom, that a contract is indefinite.  *Norick, Inc. v. Hays Companies, Inc.*, 2023 WL 7623753, at *10 (D. Minn. Nov. 14, 2023) (holding that a commission agreement was not indefinite, because the broker could

---

[4]  Broadcom's position that it can refuse renewal ███████████████████ ███████████████████████████████████ ███████████████████████████████████ ██████████████████████

simply stop generating income to avoid having to pay commissions); *see Legred v. Smeal Pork Co.,* 2002 WL 31819222, at *2 (Minn. Ct. App. Dec. 17, 2002).

Here, the Agreement has express durational terms.  It provides a 

Ex. A (at Exhibit B) § I(h).

on thirty days' notice.  *Id.* § 9.1.  Because these terms limit the Agreement's duration, Broadcom cannot claim that the Agreement is indefinite.  *See Lamoureux*, 849 F.3d at 742.[5]

In short, the Agreement's plain language unambiguously supports United's position on the merits.  While extrinsic evidence should therefore be irrelevant, Broadcom's conduct further confirms that United must prevail on the merits. Broadcom's course of conduct for years was consistent with ███████.  *See* Factual Background § C, above.  Broadcom chose to repudiate that █ only after the Broadcom acquisition of VMware, in an obvious attempt to leverage VMware's market power and to pay off the enormous debt burden Broadcom assumed to acquire CA and

---

[5] Even if the Agreement somehow were deemed to be indefinite, Minnesota law requires that the Agreement could only be terminated by Broadcom after "giving reasonable notice" to United.  *Norick*, 2023 WL 7623753, at *10.  That reasonable notice must take into account the time it would take to implement a replacement, a process that could take years, given that United has spent two decades building its mainframe infrastructure around the CA Software.  *See, e.g.*, Mansk Decl. ¶¶ 7, 16–17.

VMware.  In December 2024, Broadcom conceded it was not relying on the plain terms of any contractual provision, but instead was refusing to adhere to the Agreement's  because those terms do Ex. M at 1.

## II. ABSENT A PRELIMINARY INJUNCTION, BROADCOM'S ACTIONS WILL INFLICT SUBSTANTIAL IRREPARABLE HARM ON UNITED.

There is no question that Broadcom's refusal to comply with its contractual obligations would inflict imminent and irreparable harm on United.  *See* Factual Background § A, above.  The CA Software is "mission critical" as Broadcom itself termed it, Ex. 2 at 1, and the denial of access would immediately and irreparably harm United by preventing it from performing various core functions.  As explained above and in the attached declarations, the threatened harms include:



- Loss of ████████████████████████[6]

- Loss of ████████████████████████[7] and

- Loss of ████████████████████████[8]

---

[6] Mansk Decl. ¶¶ 6, 8–11; Vitkar Decl. ¶ 10.

[7] Krishnan Decl. ¶¶ 6–11; Bongartz Decl. ¶¶ 8–12, 14, 16–18; Billingsley Decl. ¶¶ 10, 12, 17; Mansk Decl. ¶¶ 9–12, 20–22; Vitkar Decl. ¶ 15.

[8] Krishnan Decl. ¶¶ 16, 19; Mansk Decl. ¶ 20; Vitkar Decl. ¶ 10.

These harms indisputably constitute irreparable harm because they would prevent United from performing basic functions of its business. They would also harm United's reputation and relationship with its members, providers, and regulators. Under Eighth Circuit law, "[i]rreparable harm occurs when a party has no adequate remedy at law," including "a loss of goodwill among customers." *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010). Because "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars," the "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury." *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003); *accord United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002).

Therefore, the irreparable harm element is met when a defendant's wrongful conduct, if not enjoined, will prevent a business from meeting its customers' needs. *Rogers*, 629 F.3d at 789. For example, in *Rogers*, the Eighth Circuit affirmed a finding of irreparable harm where the plaintiff operated a quarry and a challenged ordinance would prevent the quarry from expanding. *Id.* If the quarry could not expand, plaintiff would lose "the ability to grow and accommodate its customers' demands," thereby causing a "loss of goodwill" and, thus, "irreparable harm." *Id.*; *accord Coteau Properties Co. v. Dep't of Interior*, 53 F.3d 1466 (8th Cir. 1995) (holding district court erred in not finding irreparable harm where a lack of injunctive relief would cause movant "serious difficulties in meeting its contractual obligations, if not make it impossible to meet them"). Here, the harm to United and its goodwill is far more immediate, severe, and far-reaching than what was presented in *Rogers*; the harm here is not the prevention of a

business expansion: it is the substantial undermining of, and interference with, normal business operations. *See, e.g.*, Billingsley Decl. ¶¶ 8, 10, 12, 14–18, 20, 22; Bongartz Decl. ¶¶ 14–17; Krishnan Decl. ¶¶ 11, 14, 16–19; Mansk Decl. ¶¶ 9–12, 15, 23–28; Vitkar Decl. ¶¶ 17–19.

Likewise, courts have recognized that the threat of erosion to "consumer confidence" in the plaintiff's business satisfies the irreparable harm element, even in circumstances far less severe and sweeping than those presented here. *Med. Shoppe*, 336 F.3d at 805. In *Med. Shoppe*, the Eighth Circuit held that the risk of a pharmacy franchisor losing consumer confidence justified enjoining a franchisee from changing its name. *Id.* The Eighth Circuit affirmed the irreparable harm finding because the name change could leave customers "unsure whether they can get their prescriptions filled at that location" and "because the closure of one franchise may make customers wonder whether other Medicine Shoppe franchises will continue to operate in the future," thus harming the franchisor's goodwill. *Id.*; *accord Vital Images, Inc. v. Martel*, 2007 WL 3095378, at *7 (D. Minn. Oct. 19, 2007) ("This harm will be irreparable because no legal remedy can mend damaged or destroyed business relationships."); *see also Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996).

Courts have likewise found irreparable harm based on threatened disruptions to healthcare businesses, even at a much smaller scale than the disruptions here. In *Detroit Med. Ctr. v. GEAC Computer Sys., Inc.*, both the plaintiff and the public faced irreparable harm because "[w]ithout a proper functioning computer inventory system, Plaintiff runs the risk of not having adequate medical supplies and, as a corollary, not being able to

render sufficient medical services." 103 F. Supp. 2d 1019, 1023–24 (E.D. Mich. 2000). Similarly, in *Pineville Med. Ctr., LLC v. Computer Programs & Sys., Inc.*, a software company's threatened withdrawal of support created irreparable harm because "there is a very real risk that the Hospital [would] be unable to provide its patients with adequate medical care" without the software. 2019 WL 5873443, at *3 (E.D. Ky. Feb. 15, 2019). Here, cutting off United's access to the Software and Services would create those same types of harms on a national scale, affecting United's members, healthcare providers, and United itself.

Absent an injunction, United has no means to avoid the harms threatened by Broadcom's breach. █████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

Billingsley Decl. ¶ 21; Bongartz Decl. ¶¶ 18–19; Krishnan Decl. ¶¶ 12–13; Mansk Decl. ¶¶ 7, 16–19; Vitkar Decl. ¶¶ 20–21. Even a brief period of claims-processing disruptions would irreparably harm United's goodwill. *See, e.g.*, *Pineville Med. Ctr., LLC*, 2019 WL 5873443, at *4 (finding irreparable harm despite hospital possessing an alternative for defendant's software, because even with the "workaround" alternative there would be a reduction in medical services).

For example, United ███████████████████████████████

████████████████████████████████. *See* Krishnan Decl. ¶ 13; *see also* Mansk Decl. ¶¶ 7, 16–17. █████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ *See* Krishnan Decl.

¶ 13. ███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ *Id.* ¶¶ 11, 16–17; *see also* Billingsley Decl. ¶ 10; Bongartz

Decl. ¶ 14.

## III. THE BALANCE OF HARMS SUPPORTS A PRELIMINARY INJUNCTION.

The balance of harms also favors a preliminary injunction. "This factor requires

the Court to consider any harm to the defendant from granting a preliminary injunction

and to balance it with the harm to plaintiff if it is denied preliminary relief, but is

successful on the merits." *Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp.

1136, 1142 (D. Minn. 1996). In assessing the balance of harms, "courts consider the

threat to each of the parties' rights that would result from granting or denying the

injunction, the potential economic harm to the parties, and interested third parties, and

whether the defendant has already taken remedial action." *Perdue Premium Meat Co.,*

*Inc. v. Missouri Prime Beef Packers, LLC*, 2022 WL 193217, at *4 (W.D. Mo. Jan. 20,

2022) (citation omitted).

When a preliminary injunction motion merely seeks to have the defendant "abide

by the terms of the Agreement that it voluntarily entered," the balance of harms favors

the movant. *See, e.g.*, *id.*; *Jax Ltd., Inc. v. Reuter*, 2005 WL 3272060, at *5 (D. Minn.

Nov. 28, 2005) (finding "that the effect of denying the TRO would be potentially

devastating to Jax and that the effects of granting the motion would be much less significant for Reuter," who "would remain in the same position that he has been in for the past 24 years, continuing to receive royalty checks"). Such is the case here.

If the Court fails to enjoin Defendants, United would sustain irreparable harm due to the substantial disruptions to its business operations described above. Moreover, members and medical providers would also be put at risk absent an injunction due to the effects Broadcom's breach would have on everything from claims processing to customer service. *See* Section II, *supra*.

By contrast, a preliminary injunction would merely require Defendants to maintain the status quo of providing the Software and Services at contractually-prescribed prices. Defendants cannot credibly claim harm from that. Even if they dispute what the Agreement requires, they suffer no material harm from a preliminary injunction that preserves the status quo while the Court adjudicates the merits of this contractual dispute.

Further, even in the highly unlikely scenario that Defendants prevail on the merits, any asserted harm from the preliminary injunction could be readily quantified and potentially compensable through monetary damages—unlike the harm United (and the public) will suffer absent an injunction. *See, e.g.*, *Hillerich*, 943 F. Supp. at 1142 ("If the preliminary injunction is found to have been improperly granted, the damage suffered by Christian Brothers will be quantifiable in terms of lost sales and the damages will be recoverable from H & B.") (citation omitted); *Jax Ltd.*, 2005 WL 3272060, at *5.

## IV.    THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION.

The public interest also weighs in favor entry of a preliminary injunction.  *First*, the "public has an interest in enforcing contractual obligations."  *Sleep No. Corp.*, 33 F.4th at 1019; *see also Med. Shoppe*, 336 F.3d at 805 (finding "public interest would not be served by permitting a party to avoid contractual obligations").

*Second*, Broadcom's breach threatens to harm the public, including United's members.  *See* Fact Section A, above.  As detailed above, loss of the CA Software and Services will compromise United's ability to perform several of its core functions— including ███████████████████████████████████████████████████ ████████████████████████████████.  *Id.*  The public has a strong interest in avoiding those harms.  By contrast, there is no public interest in allowing Broadcom to flout the Agreement and exploit United's decades of reliance on that Agreement to demand exorbitant price increases.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction enjoining Defendants from denying United continued access to the CA Software and Services during the pendency of this action.

Dated:  April 4, 2025

**GREENE ESPEL PLLP**

*/s/ Jeanette M. Bazis*

Surya Saxena, Reg. No. 0339465
Jeanette M. Bazis, Reg. No. 0255646
Sybil L. Dunlop, Reg. No. 0390186
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
ssaxena@greeneespel.com
jbazis@greeneespel.com
sdunlop@greeneespel.com
(612) 373-0830

**BOIES SCHILLER FLEXNER LLP**

Hamish Hume (admitted pro hac vice)
Samuel Kaplan (admitted pro hac vice)
Cameron Miller (pro hac vice pending)
1401 New York Avenue, NW
Washington, DC 20005
hhume@bsfllp.com
skaplan@bsfllp.com
cmiller@bsfllp.com
(202) 237-2727

Craig Wenner (pro hac vice pending)
David Barillari (pro hac vice pending)
Lindsey Ruff (pro hac vice pending)
Claire Greenberg (pro hac vice pending)
55 Hudson Yards
20th Floor
New York, NY 10001
cwenner@bsfllp.com
dbarillari@bsfllp.com
lruff@bsfllp.com
cgreenberg@bsfllp.com
(212) 754-4498

*Counsel for Plaintiff United Healthcare Services, Inc.*